## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **WEST ASCENT VENTURES, LLC,** )<br>**and BRYAN BAST,** )<br> )<br> )<br>  **PLAINTIFFS,** )<br>**against** )<br> )<br>**MICHAEL PARRELLA, RYAN HEALY** )<br>**and SCOTT FERRARI,** )<br> )<br>  **DEFENDANTS.** ) | **Case No. 2:18-cv-2508**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs, West Ascent Ventures, LLC and Bryan Bast, for their complaint against Defendants allege as follows:

### Nature of Demand

1.     This dispute arises from ILKB LLC's ("ILKB"), Michael Parrella's ("Parrella"), Scott Ferrari's ("Ferrari"), and Ryan Healy's ("Healy") (collectively, "Defendants"), unlawful acts in connection with ILKB's sale of several kickboxing franchises to West Ascent Ventures, LLC and its principal Bryan Bast (West Ascent Ventures, LLC and Bryan Bast are collectively referred to throughout as "Franchisee" or "Plaintiffs") and Defendants' unlawful acts occurring after completing the sale of several franchises to Franchisee.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered damages in excess of $780,000.   Plaintiffs' claims include fraud, fraud by omission, breach of contract, violation of the covenant of good faith and fair dealing, tortious interference with prospective business relations, and violations of the Oregon Franchise Act, the California Franchise Investment Law, and the New York Franchise Sales Act.

## Parties

2.     West Ascent Ventures, LLC is an Oregon limited liability company and Bryan Bast is its sole owner.

3.     Bryan Bast is a citizen and resident of Oregon and the managing member of West Ascent Ventures, LLC.

4.     Michael Parrella ("Parrella") is the CEO of ILKB, LLC.

5.     Scott Ferrari ("Ferrari") is the Director of Franchise Development of ILKB LLC.

6.     Ryan Healy ("Healy") is the Vice President of Operations of ILKB LLC.

## Venue and Jurisdiction

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are of diverse citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because ILKB's registered office is in this district and because a substantial part of the events giving rise to the claims occurred in this district.

## Facts

9.     Bast initially became interested in purchasing a franchised business in or around early 2015 because he was interested in running his own business.

10.     Bast was introduced to ILKB in around February or March 2015 when his franchise broker, FranChoice and its representative Scott Jones, told him about it.

11.     Mr. Jones then introduced Bast to Scott Ferrari, ILKB's President and Director of Franchise Development.

12.     Ferrari and Bast first spoke on the telephone on March 19, 2015 and on that call Ferrari provided an overview of the ILKB system, including the economics of running an ILKB franchise and the potential of owning an ILKB franchise as an absentee owner. On that call, Ferrari also told Bast that an ILKB franchise could break even with 190 members. Bast emailed Ferrari on March 20, 2015 confirming this representation.

13.     Shortly thereafter, in early or mid-April, Ferrari sent Bast a "validation list" of roughly ten franchisees to call, as well as ILKB's 2014 Franchise Disclosure Document ("FDD").

14.     On the validation calls, each person Bast spoke to was enthusiastic and claimed that they were profitable.

15.     The FDD that Ferrari sent contained information about the franchise, including the following:

a.      Item 7 showed estimated expenses for the first three months of operations totaling $110,000 to $299,850.

b.      Item 8 contained the disclosure that franchisees' purchases from ILKB and approved suppliers will range from 40% to 43% in establishing a franchised outlet, and 5% to 10% of a franchisee's total monthly expenses. It stated that ILKB and FC Online Marketing's ("FCOM"), an ILKB affiliate, received no revenue from the sale of products or services to franchisees.

16.     When he sent the FDD to Bast, Ferrari also provided links to a number of ILKB videos, including, but not limited to the following:

a.      The Not A Fad video, in which Parrella stated that in 5-7 years, a franchisee would have "made your investment back" and "made a few $100k," and would also have opportunity to sell the franchise "in multiples."
        https://www.ilovekickboxing.com/index.php/not_a_fad_video.

b.  A marketing video in which Parrella stated that ILKB has set up a comprehensive marketing program "that does 90% of all the heavy lifting." In this video, he also showed a number of employees at computer screens and said that ILKB has graphic designers, programmers, and marketers working around the clock to get as many leads and as much business for your franchise as possible. https://www.ilovekickboxing.com/press/Marketing.mp4?awt_l=8yLO A&awt_m=43wvlTVBw7CeiGK.

c.  A video that purported to review the expenses a new franchisee could expect to incur and profits that a franchisee could expect to generate. In that video, Parrella discussed what a franchisee's expenses would be if it were breaking even (which should be with about 200 members). Parrella then reviewed the following monthly expenses:

  i.   Rent at $5,500
  ii.  Labor costs at $9,900
  iii. Cost of goods sold at $3,000
  iv.  Utilities at $800 to $1,000
  v.   Marketing at $2,500
  vi.  Miscellaneous at $2,500
  vii. Royalty of $1,550

This resulted in around $25,000 in net operating expenses on a monthly basis. Parrella went on to explain that members pay $135 per month on average, and at 200 members, this would result in $27,000 in sales, and would be right around the breakeven point. He then stated: "Each member beyond 200 is where the actual profit comes in," and that costs would not vary with an increase in members. He also stated that that any member in excess of 200 per month would result in 80% to 90% profit per member and that the next 100 members in excess of 200 would result in $11,000 to $12,000 in profit, and "in most cases, our franchisees are able to hit this breakeven point in 90 days." Parrella also stated in the video that a single unit would cost "between $160,000 and $190,000." https://www.ilovekickboxing.com/press/ilkb-what-does-a-franchise-cost.mp4?awt_l=8yLOA&awt_m=3_NDiyjqbJCeiGK.

4

17.    Ferrari also provided a document, showing that "upwards of 50%" of individuals that purchase deals through Groupon "convert into full members . . . at $125-$149 per month."  http://www.ilovekickboxing.com/press/ILKB-Groupon.pdf.

18.    Additionally, Ferrari sent another video via YouTube in which a franchise owner stated "We have increased our bottom line by six figures."

19.    Intrigued by all of the representations described above, Bast decided to attend ILKB's Discovery Day on April 16-17.  Ryan Healy ("Healy"), ILKB's Director of Franchise Operations, gave a presentation at Discovery Day on franchise unit economics.

20.    Healy said that breakeven was $25,000 (or around 190 members), labor costs would be $9,000 per month, and franchisees should spend $2,000 per month on marketing.

21.    Healy also said that ILKB had no closed units and that the business worked even with an absentee owner model.  Moreover, he said that the business could be operated with only four to five employees.

22.    Following this presentation, Bast attended dinner with Parrella.  At this dinner, Parrella told Bast that being an absentee owner would not be a problem at all, and that the ILKB franchise requires "minimal involvement" once up and running.

23.    At this dinner, Parrella confirmed Healy's representation that only four to five employees would be necessary to run the business.

24.    Parrella also told Bast that Bast would be able to sell undeveloped territories at a profit, and could use that profit to support and pay for the costs of building out other units.  He would be able to sell undeveloped territories at a profit because ILKB was increasing initial franchise fees and ILKB allows franchisees to sell undeveloped

territories.  Parrella even told Bast that if unable to find a buyer for undeveloped territories, ILKB would re-purchase them.

25.     Then, on April 22, 2015, Ferrari emailed a business plan to Bast (the "Business Plan"), along with wiring instructions to pay the initial franchise fees.  The Business Plan contained a series of financial statements, showing projections of sales and profits for the first three years of operation.

26.     The Business Plan contained, among others, the following figures:

    a.     First year sales of $190,000;
    b.     First year losses of $83,232;
    c.     Second year sales of $627,720;
    d.     Second year profits of $196,631;
    e.     Third year sales of $619,250; and
    f.     Third year profits of $191,210.

27.     The Business Plan also included a projection for the balance sheet for the first three years of operation, showing cash of $141,067 in the second year of operations and $346,277 in the third year of operations, and substantial equity for the owners ($133,399 and $324,609, respectively).

28.     The Business Plan also showed labor expenses at $11,466 per month at the most and a need to hire no more than four to five employees.

29.     Finally, the Business Plan contained a statement on the bottom of each page, lending credibility to the representations: "This business plan contains confidential, trade secret information . . . ."  Reading this, Bast believed the numbers to be accurate and based on actual financial information provided by franchisees.  In fact, the Business Plan expressly stated that "the P&L for the year is correct."

30.     Relying on the representations described above, Bast signed a multi-unit agreement on April 28, 2015, for the purchase of seven territories – one in Pennsylvania, three in California, and three in Oregon.  He also signed a franchise agreement for a location in Oregon.

31.     On the same day, Bast transferred the multi-unit agreement and franchise agreement to West Ascent Ventures, LLC.

32.     Following Franchisee's purchase of seven territories, it began looking for a suitable location in Pennsylvania to open its first unit.  Unable to find a suitable location in the Pennsylvania territory, ILKB agreed to relocate the Pennsylvania territory to California, giving Franchisee four territories in California (the new one being located in Silicon Valley).

33.     During training in November 2015 and January 2016, attended by Bast and his wife, respectively, Mr. Healy outlined franchise unit economics, which validated the financial projections described above in the Business Plan, as well as representations concerning the number of members and amount of revenue necessary to break even. Franchisee had no reason to question this information, particularly because the economics of a franchise unit remained a consistent part of ILKB's messaging to prospective and current franchisees.

34.     Franchisee then began looking for a location in Oregon. After finding a site in around December 2015, Franchisee began building out the location.  In so doing, Franchisee discovered that the costs to open were far higher than shown in the Business Plan and the FDD.  For example: travel and expense costs for training were more than five-hundred percent (500%) higher than represented in the FDD, and fixtures,

equipment, and other fixed assets were roughly $8,000 to $10,000 higher than the figure presented in the FDD.

35.     Once operational, Franchisee also discovered that operating expenses were far higher than ILKB represented.  Labor and marketing costs, in particular, were well in excess of ILKB's representations.    Specifically, representations made to Franchisee prior to purchase showed labor costs at $9,000 or, at the most, $11,466.  In fact, labor costs were roughly $18,000 per month and the business required eight to ten employees to operate it, rather than the four to five represented.

36.     Additionally, while marketing costs were supposed to be $2,000 to $2,500 per month according to ILKB's representations, those costs were $5,000 per month.

37.     Not only were expenses higher than represented, but ILKB was actually taking money out of Franchisee's pocket.  Franchisee paid for marketing a Groupon deal pursuant to which people could register for classes at special prices.  When people purchased these deals, instead of Franchisee receiving the money for purchases in its territory, ILKB's affiliate FCOM retained the money for itself.  Franchisee, however, still had to provide services for free to the Groupon purchasers.

38.     If the representations about 50% of Groupon purchasers becoming full-time members were true, this would have been more likely to be a reasonable structure. Despite the written representation that fifty percent (50%) of Groupon purchasers become members, however, the actual figure among franchisees was about ten percent (10%).

39.     Additionally, while never mentioned in the sales process or the FDD, Franchisee discovered that ILKB franchises around the country deal with attrition rates of roughly thirty-three percent (33%).  This meant that obtaining and keeping the number of

members necessary to break even or reach profitability required far more effort and cost than ILKB had represented.

40.     Moreover, in February 2016, a prospective purchaser, Nando Ramamirtham ("Ramamirthan") inquired about purchasing three of Franchisee's four territories in California for $110,000.  Franchisee agreed to the terms and approached ILKB to approve the transfer.  Ferrari, however, told Franchisee that it could not sell the territories because he was "worried" it would create a "sell off" and damage other territory values.  This stood in direct contradiction to the representations made to Franchisee prior to its purchase of the territories in which Parrella told Bast that he could sell undeveloped territories at a profit to help pay for build out and other expenses of other units.

41.     Franchisee told Ferrari about these representations and also that Parrella told him if unable to sell, ILKB would repurchase the territories.  Ferrari still refused to authorize the transfer and stated that ILKB had no interest in re-purchasing the territories. If this direct refusal to abide by its representations were not enough, ILKB then turned around and sold territories adjacent to Franchisee's to Ramamirtham in the following months.

42.     Similarly, Franchisee tried to sell its four California territories in October 2017 for $110,000.  The proposed purchaser, Chin-Chai Low ("Low"), had already been approved as a franchisee by ILKB.  To get things moving, Bast called Ferrari and left a message about the proposed sale to Low.

43.     Ferrari never returned the call.  Low, however, spoke with Ferrari and Ferrari approved the sale to Low but required Low to pay a number of fees to complete the sale.  Low wanted to discuss the issue of fees with Parrella, but Parrella never

returned Low's calls.   The lack of a response resulted in Low withdrawing from the proposed sale.

44.   A number of the other representations made to Franchisee proved to be false, and ILKB omitted material information required to be disclosed.

a.   The repeated financial performance representations, including the statements made by Parrella on the ILKB videos, by franchisees on the YouTube video, and in the Business Plan, lacked any reasonable basis; they were contradicted by performance information of which ILKB was aware that was provided by existing franchisees. Moreover, the representations were not included in the FDD as required by 16 C.F.R. 436.5(s). ILKB also did not provide the information required by 16 C.F.R. § 436.5(s)(3), including, the material bases used in deriving the representations.

b.   ILKB never disclosed that attrition made it impossible to attain or maintain the levels of membership represented as typical in the videos, at Discovery Day, and in other representations. Franchisee was unable to maintain income from existing members because of member attrition and members' failures to pay.   This problem was exacerbated by ILKB's undisclosed policy of not enforcing, or permitting enforcement of, member contracts and payment obligations through collections.

c.   The initial investment was far higher than presented in the FDD.   The travel and living expenses while training were estimated to be $900 to $1,500, but the actual costs were $8,000 to $10,000.   The high end of the estimate for equipment, fixtures, leasehold improvements, other fixed assets, and decorating costs was $147,500, but it actually cost $155,223.   Insurance was supposed to cost $1,200 but it cost $4,094.   Not only were the costs higher than shown in the FDD, they were well in excess of the $160,000 to $190,000 that Parrella said it would cost in the sales video about the cost of a franchise.

d.   ILKB never disclosed the revenue it and FCOM received from purchases for products and services by franchisees, as expressly required by 16 C.F.R. § 436.5(h)(6), and upon information and belief, both received such revenue in 2013, which should have been disclosed in the FDD.

e. The "validation call" list that Ferrari presented to Bast was a list that only included the top performing franchisees – something never disclosed to Bast.

f. Contrary to the Franchisor's statements that the business could be operated by four to five employees, at least eight to ten are required to run the business on a full schedule because of the heavy phone engagement needed to recruit and retain members. In fact, Bast and his wife Carrie both work at the location and are not paid a salary because they need to work for free to keep the business afloat.

g. Employee costs are in fact about twice as high as those quoted by the representations made to Bast in the Business Plan, on various videos, and at Discovery Day.

h. Marketing costs are twice as high as presented in the Business Plan, which showed marketing costs of $2,500 per month and the Discovery Day presentation, which stated marketing costs would be $2,000 per month.  In order to generate sufficient sales for the business, Franchisee spends $5,000 a month, and some of the resulting sales (*e.g.*, Groupon sales) go straight to FCOM, making it even more difficult to survive.

i. ILKB does not do nearly 90% of the "heavy lifting" on marketing. While it has provided some media for use, this is all it has done. Franchisee pays 1% of sales towards a marketing fee run by ILKB and Franchisee has had to use employees to generate and manage marketing programs.

j. Contrary to ILKB's representations, the franchise is not suitable for absentee ownership and requires constant attention by the owner. In fact, Bast and his wife have foregone a salary despite working tirelessly to keep the business open.

k. Item 6 of the FDD does not disclose the $30,000 first year local advertising requirement and subsequent $20,000 annual local advertising requirement, both of which are contained in the Franchise Agreement at Section 4.3(d).

l.      Despite Parrella's statements that Franchisee could sell undeveloped territories at a profit, he knew this was not true and that ILKB refused to allow Franchisee to sell such territories.

45.     Additionally, in stating that most franchisees reach the breakeven point in 90 days, Parrella assumed an obligation to make material statements necessary to make that statement not misleading.  Therefore, in failing to disclose the actual number or percentage of franchisees that accomplished this was a material omission.  This is especially true because most franchisees do not, in fact, reach the breakeven point in 90 days.

46.     Moreover, in the FDD, ILKB stated that Parrella had neither filed for bankruptcy nor been sued for fraud in the 10 years prior to the FDD.  Franchisee, however, learned in or around late September 2017 that Parrella was discharged from bankruptcy in 2008 and had been sued for a fraudulent transfer in 2004 and paid money to settle.  Both of these issues which should have been disclosed in the FDD under the New York Franchise Sales Act, California Franchise Investment Law, and Oregon Franchise Act.

47.     In addition, to these misrepresentations and omissions, ILKB has violated the covenant of good faith and fair dealing.  The business model has been changed making new programs available (*e.g.*, classes for children).  This is permissible because ILKB was expressly authorized to improve or change the System from time to time for the intended purpose of making the system more effective, economical, or competitive, and for taking advantage of new opportunities and adapting.  Nonetheless, ILKB has refused to allow Franchisee to provide this additional program.  By allowing other franchisees to

offer it but refusing to allow Franchisee to offer it, ILKB is arbitrarily discriminating against Franchisee in favor of similarly situated franchisees.

48.     Had the representations of Parrella, Ferrari, Healy, and ILKB concerning the franchise's revenue and profitability been true, Franchisee would have had annual profits of roughly $150,000 in 2017.  Instead, Franchisee lost money at a rate of $4,000 per month in 2017.  In fact, since purchasing the franchise, Franchisee has lost a total of over $230,000.  In other words, based on the information provided by ILKB, Ferrari, Healy, and Parrella, $36,000 a month in sales should result in $11,000 per month in profit, but although Franchisee was generating monthly sales of roughly $36,000 per month it was still losing money at a rate of roughly $4,000 to $10,000 per month.

49.     Additionally, Franchisee owes a minimum of $290,000 on its lease, as well as outstanding class cards with a value in excess of $100,000.

50.     Not only have the above representations proven to be false, ILKB has impeded Franchisee's ability to sell merchandise by allocating merchandise to favored franchisees and by failing to provide an adequate supply.  In fact, ILKB told Franchisee to pre-sell merchandise to customers and when it did, ILKB failed to provide sufficient supplies to fulfill such purchases, which ILKB argued was to intentionally create scarcity. This has resulted in lost merchandise sales.

51.     Franchisee sent a letter to ILKB addressing the issues described herein on or around March 5, 2018.  In that letter, Franchisee requested a meeting with ILKB and noted that if ILKB was not willing to meet, Franchisee would proceed to mediation and arbitration.

52.     On March 19, 2018, ILKB responded through its attorney that it was gathering information to respond and that it denied the allegations in the letter.  Having not heard anything by early April, Franchisee asked to set up a video conference to try to negotiate a resolution, but ILKB denied the request and asked what dates Franchisee would be available for an in-person meeting.  ILKB then directed Franchisee to negotiate with John Cornell by phone and email.  Those negotiations did not result in a resolution.

53.     While ILKB, Ferrari, and Parrella signed a tolling agreement provided by Franchisee, they shortened its duration unilaterally from six months to thirty days.  For this reason, among others, Franchisee never signed the tolling agreement.

54.     Despite ILKB's conduct described above, Franchisee has continued to operate in conformance with the franchise agreement and multi-unit agreement, and remains in good standing.

55.     As demonstrated below, the foregoing facts support the Franchisee's rights to recover damages, attorneys' fees, and costs.

## COUNT I
### (Violation of the New York Franchise Sales Act –
### Against Ferrari, Healy, and Parrella)

56.     Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

57.     The New York Franchise Sales Act applies to this dispute because the franchise and multi-unit agreements are governed by New York law.

58.     ILKB, Parrella, Healy, and Ferrari violated the New York Franchise Sales Act in at least the instances set forth above, including, but not limited to:

a.     the making of baseless financial performance representations;

14

b.      the failure to provide required disclosures when making financial performance representations;

c.      the failure to disclose attrition rates;

d.      the use of "validation" calls with franchisor-sponsored franchisees, which violates the FTC Rule's prohibition upon "shilling" 16 C.F.R. § 436.9(b) which, in turn, is a violation of § 687.2(a) and (c) of the New York Act;

e.      the failure to disclose that the "validation list" did not include a representative sample of franchisees and only included top performers;

f.      the false representations that the franchisor would handle 90% of the marketing efforts;

g.      the understating of costs in the FDD;

h.      the representation that the business could be run with four to five employees;

i.      the representation that the business would work under an absentee ownership model;

j.      the false representation that Franchisee could re-sell undeveloped territories at a profit;

k.      the failure to disclose Parrella's bankruptcy and the fraud action against him; and

l.      the failure to disclose revenue ILKB and FCOM received from required purchases by franchisees.

59.     Had Defendants not misled Franchisee, Franchisee would not have purchased the franchises and would not have suffered the losses associated with the purchase of several franchises.

60.     Pursuant to Gen. Bus. L. § 691.1, Plaintiffs are entitled to rescission and damages in an amount not less than $780,000, with interest at six percent per year plus reasonable attorneys' fees and court costs.

## COUNT II
**(Violation of the California Franchise Investment Law –
Against Ferrari, Healy, and Parrella)**

61.     Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

62.     The California Franchise Investment Law ("CFIL") prohibits the making of false or misleading statements or omissions of fact necessary to make statements made not misleading.

63.     ILKB, Parrella, Healy, and Ferrari made misrepresentations, misleading omissions and other conduct in violation of the California Franchise Investment Law, including but not limited to those spelled out in ¶ 59 above.

64.     The CFIL expressly applies to officers and directors of a franchisor liable under the law, as well as every employee who materially aids in the act constituting the violation.

65.     Had Defendants not misled Plaintiffs, Plaintiffs would not have purchased the franchises and would not have suffered the losses associated with the purchase of several franchises.

66.     Pursuant to Cal. Corp. Code § 31300, Plaintiffs are entitled to damages in an amount not less than $780,000, for rescission in the case of willful violations, and for recovery of attorneys' fees and costs.

## COUNT III
### (Violation of the California Unfair Competition Law –
### Against Ferrari, Healy, and Parrella)

67.     Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

68.     The California Unfair Competition Law ("UCL") prohibits any unlawful, unfair, or fraudulent business acts or practices, and unfair, deceptive, untrue, or misleading advertising. Cal. Bus. & Prof. Code § 17200, *et seq.*

69.     ILKB, Ferrari, Healy, and Parrella engaged in a number of unlawful acts prohibited by the UCL by making false and misleading statements in inducing Plaintiffs to purchase franchise territories and by deceptively and misleadingly omitting material information in an unfair and fraudulent manner. Such conduct is described in more detail in ¶ 59, among others.

70.     As a result of Defendants' conduct in violation of the UCL, Plaintiffs are entitled to rescission and not less than $780,000. Plaintiffs are also entitled to recover costs and fees (including reasonable attorneys' fees).

## COUNT IV
### (Violation of the Oregon Franchise Act – Against Ferrari, Healy, and Parrella)

71.     Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

72.     ILKB, Parrella, Healy, and Ferrari made misrepresentations, misleading omissions and other conduct in violation of the Oregon Franchise Act, including but not limited to those spelled out in ¶ 59 above.

73.     The Oregon Act is applicable to Plaintiffs because at least three of the franchises sold to Plaintiffs were to be operated in the State of Oregon and Claimant opened a franchise location in Oregon.

74.     The Oregon Act expressly applies to officers and directors of franchisors liable under the Act, as well as to every person who participates or materially aids in the unlawful sale of a franchise.

75.     Had Defendants not misled Plaintiffs, Plaintiffs would not have purchased the franchises and would not have suffered the losses associated with the purchase of several franchises.

76.     Pursuant to Or. Rev. Stat. Ann. § 650.020, Plaintiffs are entitled to recover amounts that the franchisee would be entitled to in an action for rescission, amounting to not less than $780,000, plus costs and reasonable attorneys' fees.

## COUNT V
### (Fraud – Against Ferrari, Healy, and Parrella)

77.     Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

78.     ILKB, Parrella, Healy, and Ferrari made misrepresentations and other false statements of material fact, including but not limited to those spelled out in ¶ 59 above.

79.     Defendants knew that the misrepresentations were false and misleading at the time made, yet made them to induce Plaintiffs to purchase several franchises.

80.     Franchisee reasonably relied on these misrepresentations in purchasing seven ILKB franchises.

81.    Had Defendants not misled Plaintiffs, Plaintiffs would not have purchased the franchises and would not have suffered the losses associated with the purchase of several franchises.

82.    Plaintiffs are entitled to recover the losses suffered as a result of Defendants' fraud, in an amount not less than $780,000, plus costs and reasonable attorneys' fees, as well as punitive damages arising from the willful and wanton fraud perpetrated by Defendants, illustrated by their intentionally making false and misleading statements.

## COUNT VI
### (Negligent Misrepresentation – Against Ferrari, Healy, and Parrella)

83.    Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

84.    ILKB, Parrella, Healy, and Ferrari negligently made false statements in the course of a selling seven franchises to Plaintiffs, including but not limited to those spelled out in ¶ 59 above.

85.    If ILKB, Parrella, and Ferrari did not know that the misrepresentations and omissions were false and misleading, they made the misrepresentations and omissions with disregard for the truth.

86.    Franchisee reasonably relied on these misrepresentations in purchasing seven ILKB franchises.

87.    Had Defendants not misled Plaintiffs, Plaintiffs would not have purchased the franchises and would not have suffered the losses associated with the purchase of several franchises.

88.    Plaintiffs are entitled to recover the losses suffered as a result of Defendants' negligent misrepresentations, in an amount not less than $780,000 plus costs and reasonable attorneys' fees.

**COUNT VII**
**(Fraud by Omission – Against Ferrari, Healy, and Parrella)**

89.    Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

90.    ILKB, Parrella, Healy, and Ferrari had several duties to disclose material information, including, but not limited to, the following:

a.    The New York Franchise Sales Act, CFIL, and Oregon Act require disclosing the franchisor's and its affiliates' revenue from the sale of products and services to franchisees in the FDD;

b.    By disclosing what was referred to as a "validation list" with franchisee contact information, ILKB had a duty to disclose that the list included only top performing franchisees and was not a representative sample of the system;

c.    The FTC Franchise Rule, New York Act, CFIL, and Oregon Act also require that certain disclosures be made when financial performance representations are made, as described above, including the reasonable basis for the representations and information required to be disclosed in order to make the representations not otherwise misleading;

d.    By providing information about the number of members necessary to break even and reach profitability, ILKB, Parrella, Healy, and Ferrari had a duty to disclose that member attrition made it difficult to maintain the number of members necessary to break even;

e.    The statutes require disclosure of certain bankruptcy and fraud actions, both of which were subject to disclosure here, and ILKB failed to do so; and

f. By stating that most franchisees reach the breakeven point in 90 days, ILKB and Parrella had a duty to disclose the actual number and percentage for who this was true to make the representation not otherwise misleading.

91. Each of the above duties resulted in the need to make disclosures that ILKB, Parrella, Healy, and Ferrari failed to make.

92. These omissions were peculiarly within the knowledge of ILKB, Parrella, Healy, and Ferrari, and they knowingly withheld that knowledge to induce Franchisee to purchase a number of franchises.

93. Had Defendants not misled Plaintiffs, Plaintiffs would not have purchased the franchises and would not have suffered the losses associated with the purchase of several franchises.

94. Plaintiffs are entitled to recover the losses suffered as a result of Defendants' fraud by omission, in an amount not less than $780,000 plus costs and reasonable attorneys' fees, as well as punitive damages arising from the willful and wanton fraud perpetrated by Defendants, illustrated by their intentionally making false and misleading statements.

## COUNT VIII
### (Tortious Interference with a Prospective Economic Advantage – Against Ferrari, and Parrella)

95. Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

96. ILKB refused to allow Franchisee to sell its territories to Ramamirthan, on the grounds that it would not approve a sale of undeveloped territories after Parrella expressly told Franchisee during Discovery Day that it could sell undeveloped territories.

21

Such conduct constitutes fraudulent and wrongful conduct in interfering with the proposed sale.

97.     The wrongful nature of ILKB's conduct is further exacerbated by the fact that it simply usurped Franchisee's business opportunity.  Shortly after refusing to allow what it had expressly stated it would allow, ILKB turned around and sold territories adjacent to Franchisee's territories to Ramamirthan. Thus, ILKB had a bad faith motive in disapproving the sale.

98.     Similarly, by refusing to respond to requests to approve Franchisee's sale to Low, despite Parrella's prior statements that it ILKB would allow Franchisee to sell undeveloped territories, ILKB tortiously interfered with this potential sale.

99.     Plaintiffs were injured as a result of Defendants' tortious interference with a prospective economic advantage, and is entitled to recover those losses – an amount not less than $780,000 plus costs and reasonable attorneys' fees.

100.    WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment for damages in an amount to be determined, but not less than $780,000, plus punitive damages, attorneys' fees and such other and further relief as the Court determines.

Dated:  April 27, 2018            **GARNER & GINSBURG, P.A.**

By _____
W. Michael Garner
Garner & Ginsburg, P.A.
5030 Broadway
Suite 631
New York, NY 10034
 wmgarner@yourfranchiselawyer.com
(612) 259-4801 (Telephone)
(612) 259-4810 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS**